IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-02681-RBJ

IN RE: ADAM AIRCRAFT INDUSTRIES, INC.,

    Debtor.

---

GEORGE F. ADAM JR.,

    Appellant,

v.

JEFFREY A. WEINMAN, as Chapter 7 Trustee and
ALLEN & VELLONE, P.C.,

    Appellees.

---

## ORDER

---

George F. Adam, Jr. appeals from a bankruptcy court award of a partial contingent fee to the Trustee's special counsel notwithstanding that, in Mr. Adam's view, there was no "recovery" to the bankruptcy estate on which a contingent fee could be calculated. For the reasons set forth in this order, the judgment of the bankruptcy court is affirmed.

### FACTS and CASE HISTORY

Mr. Adam was the founder and the largest common shareholder of Adam Aircraft Industries, Inc., a manufacturer of small aircraft. On February 15, 2008 Adams Aircraft filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code. Morgan Stanley Senior Funding, Inc. and Morgan Stanley & Co., LLC, on behalf of themselves and a consortium of

other lenders (collectively "Morgan Stanley"), were the largest secured creditors of the estate. Morgan Stanley also had substantial unsecured claims.

Asset Sale

A few months after the bankruptcy filing the Trustee, Jeffrey A. Weinman, sold the debtor's assets for $10 million cash in a single transaction.  Initially the Trustee agreed that Morgan Stanley and the bankruptcy estate would divide the portion of the sales proceeds that was subject to Morgan Stanley's security interest, 91% to Morgan Stanley and 9% to the estate. R. 279-80.[1]  The Trustee, apparently pursuant to that agreement and with the approval of the bankruptcy court, distributed $5,826,837.30 of the sale proceeds to Morgan Stanley.  R. 70.

Investigation of Potential Claims against Morgan Stanley

Later the Trustee decided that he should investigate the validity of that he calls the "forced transfer" of those funds to Morgan Stanley as well as Morgan Stanley's conduct in the months leading up to the bankruptcy petition.  He described the circumstances of this bankruptcy as unique in his experience (which includes serving as a trustee in more than 25,000 bankruptcy cases) because it involved the "sudden failure of a company that had been operating full bore just a month or so before and had obtained financing somewhat shortly before, in excess of $100 million, and then the secured lender's actions . . . effectively put it out of business."  R. 276.

In March 2010 the Trustee applied for the court's approval, pursuant to 11 U.S.C. § 327, to retain the Denver law firm of Allen & Vellone as Special Counsel to the Trustee for the

---

[1]  Certain assets such as avoidance actions were not subject to Morgan Stanley's security interest.

purpose of investigating Morgan Stanley's conduct.  R. 7-8.[2]  Allen & Vellone is a firm with

which Mr. Weinman has had a long association.[3]  The fee was to be determined by the firm's

hourly rates of $375 for Patrick D. Vellone, $285 for Mathew M. Wolf, $110 for law clerks and

$100 for paralegals, subject to the court's ultimate review and approval.  *Id.*  The court approved

the application on March 11, 2010.  R. 16.

Over the next seven to eight months the law firm investigated potential claims against

Morgan Stanley and billed for its services using the hourly rate schedule.  The law firm

determined that the estate did have viable causes of action, and the estate authorized the firm to

file a complaint based on those claims.  R. 17-18.

Modified Contingency Fee Agreement

According to both Mr. Vellone and the Trustee, the Trustee wanted the law firm to

pursue the litigation solely on a contingency fee.  R. 243, 260; 282.  The Trustee's concern was

that the litigation could be "hard and long and costly."  R. 283.  He claims that he did not

anticipate an easy, quick settlement.  *Id.*  In any event, Mr. Vellone declined to take the case

solely on a contingent basis, indicating that it was more risk than his law firm was willing to

take.  R. 243.

Nevertheless, according to Mr. Vellone, he did believe that the case offered sufficient

potential to justify a blended hourly and contingent fee arrangement.  R. 245.  Ultimately, Mr.

Vellone and the Trustee negotiated a Modified Contingency Fee Agreement.  R.21.  Under that

---

[2] Section 327(a) of the Bankruptcy Code permits a trustee, with the court's approval, to employ attorneys to represent or assist the trustee in carrying out the trustee's duties.

[3] Mr. Vellone has known Mr. Weinman for about 25 or the 27 years he has practiced law, and he has either represented him or co-counseled cases with him more than one hundred times.  R. 257.

Agreement the fee would be determined by a combination of 75% of the firm's normal hourly

rates plus 15% of the "gross amount recovered" by the firm on behalf of the estate through

settlement or trial.  *Id.*  The term "gross amount recovered" was defined to mean "the total

amount recovered before any subtraction of expenses and disbursements, including any amount

collected by virtue of trial or any settlement of the Matter prior to trial *or any reduction in the*

*Client's liability to the Defendants under the Bankruptcy Code.*"  R. 21-22 (emphasis added).

Mr. Adam objected that the proposed modification was not in the best interest of the

estate or its creditors.  R. 34.  He argued that the only change in circumstances was that the

firm's investigation had revealed that the estate had meritorious claims.  There was no

suggestion that the estate could not continue to pay on an hourly rate basis.  Although neither the

Trustee nor the law firm had provided an estimate of the recovery, Mr. Adam suggested that it

potentially could be in the tens of millions of dollars.  He argued that there was no justification

for permitting the firm to continue to bill hourly rates while also being allowed to participate in

the recovery.  R. 35-38.

Before the modified contingency agreement was considered by the bankruptcy court, and

apparently because counsel was concerned about a possible statute of limitations problem, the

law firm filed a lawsuit against Morgan Stanley in district court seeking damages for breach of

contract.  *Jeffrey Weinman, as Chapter 7 Trustee for the Bankruptcy Estate of Adam Aircraft v.*

*Morgan Stanley Senior Funding, Inc., Morgan Stanley & Co., Inc.*, No. 10-cv-2933-REB-KMT.

The parties then began, for the first time, to explore possible settlement.  Mr. Vellone focused

primarily on Morgan Stanley's secured interest in the remaining money in the estate's bank

account.  However, a secondary concern voiced by the Trustee was that even if the estate could

obtain a release of the secured claim, Morgan Stanley was still in a position potentially to get back through its unsecured claims everything they might give up by releasing the secured claim. R. 285-86.  In any event, the initial settlement negotiations were unsuccessful.  R. 285.

Meanwhile, Mr. Vellone decided that, because of certain liability releases in the contracts with Morgan Stanley, a better strategy would be to pursue claim subordination in the bankruptcy court.  R. 247.  On March 9, 2011 the law firm filed a voluntary notice of dismissal of the district court case and, on the same day, it filed an Adversary Complaint on behalf of the Trustee against Morgan Stanley in the bankruptcy court.  R. 42.

In the Adversary Complaint the Trustee alleged that in early 2007 Morgan Stanley agreed to underwrite $120 million in financing for Adams Aircraft; then, after the company ceased negotiations with other prospective lenders, Morgan Stanley cut its commitment to $80 million, still taking a $4 million transaction fee; then, after taking substantial losses in the credit crisis that emerged in mid-2007, Morgan Stanley without cause served the company with a notice of default and froze approximately $40 million in the company's accounts, basically a ruse to get out of its commitment to Adams Aircraft.  The Trustee alleged that Morgan Stanley's actions made it impossible for the company to continue to operate and forced it into bankruptcy.  R. 46-55.  The Trustee sought equitable subordination or disallowance of Morgan Stanley's secured and unsecured claims and remission to the estate of approximately $36 million that Morgan Stanley had been paid on the loan.  R. 56-57.

On March 11, 2011, two days after the filing of the Adversary Complaint, the bankruptcy court heard argument on Mr. Adam's objection to the modified contingency fee agreement. Instead of ruling definitively one way or the other, the court decided to approve the fee

agreement "at least for now . . . for purposes of allowing this case to go forward," adding that "if there is success" the court would deal with the fee issue then.  R. 137.

Settlement

No formal discovery was obtained in the adversary proceeding.  Morgan Stanley filed a motion to dismiss under Rule 12(b), which was denied.  *In re Adam Aircraft Industries, Inc.,* 2012 WL 646273, at *5 (Bankr. D. Colo. Feb. 28, 2012).  The Trustee and Morgan Stanley then negotiated a settlement.  R.69-75.

In the Settlement Agreement the parties recited, as relevant here, (1) that Morgan Stanley had asserted secured claims totaling approximately $56.6 million on behalf itself and other lenders who participated in the Morgan Stanley loan; (2) that the Trustee had sold substantially all of the company's assets to a third party for a gross purchase price of $10 million; (3) that the Trustee had paid $5,826,837.30 to Morgan Stanley from those proceeds; (4) that, after deducting the Trustee's Carve-out Proceeds ($581,255.45) and certain other amounts ($910,824.25), the "Remaining Sales Proceeds" from the $10 million asset sale were $2,681,083.00;[4] (5) that Morgan Stanley had a secured interest in the Remaining Sales Proceeds; (6) that Morgan Stanley asserted an unsecured claim in whatever is not covered by its secured interest in the Remaining Sales Proceeds, including the "Trustee's Carve-Out Proceeds" and the "Trustee's Recovery Proceeds" (monies that the Trustee has recovered "by virtue of avoidance and similar actions");

---

[4] The figure $910,824.25 is a number I derived by subtracting from the $10 million sales proceeds the $5,826,837.30 paid to Morgan Stanley and $581,255.45 in Trustee Carve-out Proceeds, and the $2,681,083.00 denominated as the "Remaining Sales Proceeds."  It might be explained in an order entered March 10, 2008.  *See* Settlement Agreement, Recital G.  R. 70.  That order was not included in the record filed with this Court.  If one takes 45.72% of what the Trustee's motion describes as "$2,028,316 in preference recoveries plus additional estate recoveries (the 'Trustee Recovery Proceeds')," R.64, the result is a different number: $927,346.08.

(7) that the bankruptcy court had determined that the City of Pueblo is entitled to a payment from the Remaining Sales Proceeds of $709,065.72 on a lien claim; [5] and (8) that the Trustee had commenced an Adversary Proceeding seeking, among other things, equitable subordination of Morgan Stanley's claims. R. 69-70. The settlement provided that Morgan Stanley would assign its secured claim to the Trustee and subordinate its unsecured claim to all other claims, and the Trustee would seek dismissal of the Adversary Proceeding and release Morgan Stanley from all other claims. R. 71-72.

In a motion to approve the settlement the Trustee stated that he believed that the value of the settlement to the bankruptcy estate was "at least $3,097,952.99." R. 63, ¶4.d. This was represented to be 91% of Morgan Stanley's secured claim in the Remaining Sales Proceeds plus 45.72% of Morgan Stanley's unsecured claim. R. 64.

Specifically, the value to the estate of the release of Morgan Stanley's secured claim was said to be $1,794,535.72, derived by deducting the Pueblo lien ($709,065.72) from the Remaining Sales Proceeds ($2,681,083.00) and multiplying by .91 (91%). The Trustee estimated that all unsecured claims totaled $111,000,000; that Morgan Stanley's unsecured claims totaled $50.7 million, or 45.72% of the total; and, therefore, that Morgan Stanley had a 45.72% interest in the sum of (1) $241,297.47, being the nine percent of the Remaining Sales Proceeds not covered by Morgan Stanley's security interest; (2) $581,255.45, being the "Trustee Carve-out Proceeds;" and (3) $2,028,316.00, being the "Trustee Recovery Proceeds." Thus,

---

[5] The Trustee believed that the Pueblo lien was only worth $301,094.89 and appealed the bankruptcy court's valuation. The appeal for the most part was not successful, but it did result in decreasing the Pueblo lien from $709,065.72 to $706,819.32. *In re Adam Aircraft Industries, Inc.*, No. 12-cv-11573-CMA, 2013 WL773044, at *4 (D. Colo. Feb. 28, 2013).

Morgan Stanley's unsecured claim totaled $1,303,417.27.  The total savings was the sum of $1,303,417.27 and $1,794,535.72, i.e., $3,097,953.99.

According to Mr. Vellone, there were no objections to the settlement.  R. 252.  The bankruptcy court issued a brief order, in the form tendered by the Trustee, approving the settlement on July 3, 2012.  R. 77.

Fee Application

On July 30, 2012 the law firm filed an application for approval of $538,085.95 in attorney's fees and $10,145.82 in costs.  R. 78.  The law firm represented that the hourly component of the requested fee award was $73,086.37.  R. 84.  It represented that the reduction it had achieved in the estate's liability to Morgan Stanley was $3,099,977.22, R. 82.[6]  Fifteen percent of that number is $464,996.58.  The sum of those two numbers is $538,082.95, a number $3.00 less than the fee requested.[7]  The fee amounts to more than five times what the fee would have been at 100% of the law firm's normal hourly rates.

As for the Adversary Proceeding, Mr. Vellone insisted that he still believed that the Trustee's claims were meritorious.  However, he characterized the litigation as uncertain, risky and expensive – so much so that he gave it no monetary value. R. 65-66.  Rather, "by causing Morgan Stanley to forego its secured and unsecured claims, any rights in all current and future estate assets, and assign its lien in the Reserve Fund to the Estate, the Estate will have achieved

---

[6] This number is higher than the $3,097,952.99 originally determined to be the amount of the savings because of the reduction of the Pueblo lien ordered by the district court.  *See* n.6 *supra.*

[7] The law firm represented in its motion that the hourly component was $73,086.37.  This is 75% of the rates that would have been charged.  However, the supporting affidavit of Patrick Vellone states that the hourly component was $72,850.13.  R. 95.  That would make a difference of $236.24 in the amount of the fee.  Neither Mr. Adam nor the bankruptcy court has made an issue on appeal of that nominal difference.

through this settlement 100% of the relief it seeks in its Equitable Subordination claim in the Adversary Proceeding." *Id.* at 67.

<u>Objection and Hearing</u>

On October 5, 2012 Mr. Adam filed an objection to the contingent portion of the fee application, purportedly on behalf of himself and all other creditors of the bankruptcy estate. R. 141. The law firm filed a response. R. 148. The bankruptcy court held a hearing on the application for attorney's fees and costs on November 13, 2012. R. 211-318 (transcript). Counsel for the law firm called two witnesses, Mr. Vellone and the Trustee, in support of the application.

Mr. Vellone testified, among other things, that a fee contingent on either a recovery or a reduction in liability is customary in lender liability cases. R. 243. He added that most lender liability cases are resolved by claims reduction. R. 243-44. His firm had handled other cases on a combination of discounted hourly rates and a discounted contingency fee. "In fact, they're pretty common." R. 245. In contrast, in "garden-variety" cases where trustees challenge proofs of claim the standard practice is that counsel is hired on an hourly rate. R. 273.

The Trustee testified that Morgan Stanley's release of its secured and unsecured claims in the settlement "at least – at least – doubled whatever distribution there will be to the unsecured creditors." R. 288.[8] He added that he never thought when the Adversary Proceeding was brought that Morgan Stanley would write a check to the bankruptcy estate. His hope was that he could retain the funds in the estate's bank account and get rid of the unsecured claims. R. 290.

---

[8] Mr. Weinman testified that, as of the date of the attorney's fee hearing, he believed there was between $4 and $5 million in the estate, about half from the remainder of the "Remaining Sales Proceeds," and the rest from separate adversary proceedings brought by the Trustee. R. 298-301.

Mr. Adam through counsel opposed the contingent piece of the fee application.  In his view, Colorado's Rules Governing Contingent Fees, found at Chapter 23.3 of 1 COLORADO COURT RULES – STATE (2015) (hereafter "Colorado Contingent Fee Rules"), and related case law base contingent fees on amounts actually recovered, not on saving a client from paying out to the other side.  R. 216-21.  He did not oppose compensating the law firm according to the original agreement (which the parties agree would have been $97,448.50 at 100% of the hourly rates).  R. 222-24.

During the hearing counsel for Mr. Adam cross-examined the law firm's two witnesses, Mr. Vellone and the Trustee, Mr. Weinman.  During cross-examination of Mr. Vellone, counsel also suggested, apparently for the first time, that the law firm might not have provided the Trustee with a written disclosure statement, as required by Rule 4 of Colorado's Rules Governing Contingent Fees.  R. 262.[9]  Mr. Adam did not call any other witnesses.

In his closing argument counsel emphasized his agreement, on behalf of Mr. Adam, that Morgan Stanley put the company into bankruptcy; that there was good basis for litigation against Morgan Stanley; that it was going to be difficult litigation; that he understood the risks, problems and costs that would be involved; and that the settlement benefitted the estate.  R. 303-05.  But, in his view, the contingency fee component of the modified contingency agreement was inappropriate.  The firm would have been compensated at their normal hourly rates, there was no recovery in the usual sense of the word, and attempting to determine the dollar amount saved for the client is a matter of speculation.  R. 305-10.

---

[9] Mr. Vellone testified that he made the disclosures orally.  He believed that they had also been provided in writing, although he did not have a copy available at the hearing.  R. 262-64.

Counsel for the law firm responded that Mr. Adam had no standing to challenge the fee arrangement, which was a contract between the law firm and its client, the Trustee. R. 313. Alternatively if the court invalidated the fee agreement, then the law firm would be entitled to receive the "reasonable value of their services." R. 313-14. He suggested that the fee requested did reflect the reasonable value of the services as determined by applying the relevant factors per § 330 of the Bankruptcy Code, the *Johnson [v. Georgia Highway Express, Inc.,* 488 F. 2d 714 (5th Cir. 1974], and the Rules of Professional Conduct. R. 314-16.

Bankruptcy Court Ruling

After taking the matter under advisement, the bankruptcy court issued written findings and conclusions on February 1, 2013. R. 166-75. The court began with §§ 328 and 330 of the Bankruptcy Code. In relevant part § 328 provides,

> (a) The trustee . . . , with the court's approval, may employ . . . a professional person . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

In relevant part § 330 provides,

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a . . . professional person employed under section 327 . . .
>
> > (A) reasonable compensation for actual, necessary services rendered by the . . . professional person . . . ; and
> >
> > (B) reimbursement for actual, necessary expenses.
>
> (2) The court may . . . award compensation that is less than the amount of compensation that is requested.

(3) In determining the amount of reasonable compensation to be awarded . . . the court shall consider all relevant factors, including –

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title

(D) whether the services were performed within a reasonable amount of time, commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonably based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B) [which is not relevant here], the court shall not allow compensation for . . .

(ii) services that were not  --
(I) reasonably likely to benefit the debtor's estate; or
(II) necessary to the administration of the estate.

11 U.S.C. § 330(a)(1)-(4).

The court reasoned that, under these provisions and cases interpreting them, the threshold issue is whether the attorney has demonstrated that his services benefitted the estate.  If benefit is shown, then the court determines the reasonableness of the fee using a "lodestar" analysis.  R. 171.

The court found that the settlement benefitted the estate.  While Morgan Stanley retained the $5,826,837.30 distribution that the court had approved in 2009, the release of its secured and unsecured claims to the remaining assets meant that "all of the estate's unencumbered funds may be paid to unsecured creditors other than Morgan Stanley, resulting in a benefit to the estate."  R. 172.

Regarding reasonableness of the fee, the court turned to *In re Market Center East Retail Property,* 469 B.R. 44 (B.A.P. 10th Cir. 2012).  There, after construing the factors listed in § 330(a)(3) of the Code as illustrative but not exhaustive, the bankruptcy appellate panel stated,

> Indeed, the only prohibition upon a court's review of compensation is found when a court approves a contingent fee under § 328.  It is well established that once a contingent fee has been approved under § 328(a) the bankruptcy court may not revoke such approval and award compensation upon something other than a contingent fee basis unless "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

*Id.* at 54.

The bankruptcy court noted the law firm's claim was based on its claim that the settlement reduced the estate's liability to Morgan Stanley by $3,099,997.22.  R. 173.  The court did not expressly analyze that figure or make its own finding as to the amount of the reduction of liability.  Instead, it implicitly found the figure and the resulting $464,999.58 contingent fee to be reasonable "because the estate benefitted due to reduced liability, and . . . Adam has not established any basis for changing the Modified Contingency Fee Agreement."  *Id.*

The court approved the amount of costs requested, $10,086.37, finding that they had been appropriately itemized and appeared to be reasonable.  R. 174.  However, it rejected the hourly rate component of the fee request, without prejudice, because the law firm had submitted only a summary of the hours billed rather than the itemization required by a local bankruptcy rule.  R. 173.  But after the law firm filed a supplemental application including the itemization of its hours and charges as required by the local rule, the hourly rate component of the fee, $73,086.37, was also approved.  R. 320.

First Appeal

On May 6, 2013 Mr. Adam filed a notice of appeal from the bankruptcy court's orders approving the law firm's fee application. R. 321. The district court, by Judge Arguello, noted that in *In re Market Center East Retail Property, Inc.,* 730 F.3d 1239 (10th Cir. 2013), the Tenth Circuit had overturned the bankruptcy appellate panel's decision cited by the bankruptcy court and had held that the bankruptcy court must consider the § 330(a)(3) and relevant *Johnson* factors "and only those factors" when evaluating the reasonableness of attorney's fees under § 330. R. 330. Because the bankruptcy court had listed but not analyzed those factors, instead approving a contingent fee under § 328, Judge Arguello reversed the approval of the requested fee and remanded for reconsideration of the fee agreement in light of those factors. R. 331.

The Bankruptcy Court on Remand

With the bankruptcy court's consent, both Mr. Adam and the law firm simultaneously submitted proposed findings of fact and conclusions of law. No additional evidence was taken. In a written order issued September 12, 2014 the court listed and discussed each § 330 factor and each *Johnson* factor. R. 378-89.

Regarding the six § 330(a)(3) factors, the court found, based on its review of the firm's work and billing records, that the time spent (380 hours) was reasonable. R. 380. The rates were comparable to rates charged in the community by attorneys of similar skill in similar cases. *Id.* The services were beneficial to the estate because, as the court had previously found, the release of Morgan Stanley's secured and unsecured claims provided the estate with more money than it would have had if the claims had remained in place. R. 381. The matter involved complex

14

transactions and legal questions and were performed in a reasonable time.  *Id.*  The attorneys

who worked on the engagement had demonstrated skill and professionalism in bankruptcy

matters, particularly where lender liability issues were involved.  R. 381-82.  And, critically, that

the compensation requested was reasonable.  R. 382.

The latter finding of reasonableness was based on a number of additional findings

concerning the "hybrid" combination of hourly and contingent fees.  The court cited Mr.

Vellone's testimony that most lender liability cases are resolved by claims reduction, and that a

discounted hourly fee combined with a discounted contingency fee based on either a recovery or

a reduction in liability of the defendant is "pretty common" in such cases.  R. 382.  The court

also found that the law firm agreed to represent the trustee when other firms expressed no

interest.  The court specifically found the testimony of Mr. Vellone and Mr. Weinman to be

"credible and reliable."  R. 383.  Further, while acknowledging that the published case law

regarding hybrid contingency fees is "sparse," it concluded that it did not follow that such fees

are improper or that they are not customary.  Moreover, said the court, while *In re Market Center*

*East Retail Property* cautioned courts to avoid relying on a "big risk/big reward" argument in

evaluating the "time spent" factor under § 330(a)(3)(A), it also recognized that §330(a) does not

mandate any particular fee arrangement.  R. 383.

The court also went through the *Johnson* factors, one by one, noting that his findings on

the § 330(a)(3) factors applied equally to several of the *Johnson* factors.  In addition, with

respect to "The Customary Fee," the Court found that the hybrid fee arrangement, while less

common than either straight hourly rate or contingent fee agreements, was negotiated by the

Trustee, as the estate's fiduciary, after the Trustee obtained an initial assessment of the viability

of the estate's claims against Morgan Stanley.  R. 385.  With respect to "The Amount Involved

and the Results Obtained," the court pointed to the Trustee's representation that withdrawal of

Morgan Stanley's secured claim to approximately $2 million in sales proceeds and its agreement

not to assert an unsecured claim "enabled the Trustee to distribute funds to creditors other than

Morgan Stanley, a distinct financial benefit to the estate."  R. 387.  As to the "Undesirability" of

the case, the court noted that the Trustee had discussed the case with his primary counsel, who

had expressed no interest.  *Id.*

On "The Nature and Length of the Professional Relationship," the court noted the

Trustee's representation that he had employed the law firm with good results in the past, and Mr.

Vellone's testimony about his long professional relationship with Mr. Weinman.  *Id.*  Finally,

under the heading "Awards in Similar Cases," the court noted Mr. Vellone's testimony, which he

repeated that he found to be credible, that he had performed services under similar hybrid

arrangements in other cases, once resulting in a fee that was five times the lodestar amount, and

another time receiving no contingent fee when the verdict was returned for the opposing party.

R. 388.

Based upon those findings and its analysis of the applicable factors, the court again

awarded $73,086.37 the firms recorded hours at 75% of the firm's normal hourly rates; plus

$464,999.58, the contingent fee component based on 15% of $3,099,997.22; plus $10,145.82 in

expenses.  R. 389.  The court denied the law firm's request for permission to file a second fee

application for the time spent on Mr. Adam's objection and the appeal.  *Id.*  The court entered its

judgment accordingly.  R. 402.

16

<u>Second Appeal</u>

Mr. Adam appealed again, and this time the system assigned the appeal to this Court.  It has been fully briefed.  Neither party has requested oral argument.

## STANDARD OF REVIEW

The bankruptcy court's conclusions of law are reviewed de novo, but the court's findings of fact are reviewed under a clearly erroneous standard.  *In re Market Center East Retail Property,* 730 F.3d at 1244.  "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made."  *Id.* (quoting *In re Commercial Fin. Servs.,* 427 F.3d 804, 810 (10th Cir. 2005)).

## CONCLUSIONS

Mr. Adam's appeal boils down to the argument that a contingent fee may not be awarded absent an influx of funds to the estate, although he comes at it from three different angles: (1) there was no recovery on which a contingency fee could be based; (2) a contingency fee cannot be based on the amount of cash in the client's bank account; and (3) Colorado law requires a recovery of funds in order to receive a contingent fee.  I will discuss each argument in turn.

**A.   <u>Is a Recovery of Funds a Necessary Requirement for a Contingency Fee?</u>**

I begin by putting the Modified Contingency Fee Agreement in the proper context.  First, and contrary to Mr. Adam's Opening Brief, the evidence in the record does not support the proposition that the Allen &Vellone law firm "sought to change the fee agreement to add a contingency fee in addition to hourly fees."  ECF No. 9 at 7.  Rather, the uncontested evidence is

that it was the Trustee, not the law firm, who requested that the litigation be handled on a contingency fee.  After Mr. Vellone indicated that his firm was not willing to take that much risk, he and the Trustee compromised on a hybrid fee arrangement that included both an hourly and a contingency component.

Second, the evidence does not suggest that basing a contingent fee on the "reduction in the Client's liability to the Defendants" was irrational.  Morgan Stanley's claims, if successfully pursued, would consume most if not all of the estate's remaining funds.  The evidence is that the Trustee's primary objective in pursuing the Adversary Proceeding was to retain the funds in the estate's bank account by getting rid of Morgan Stanley's claims.  He testified that he did not expect Morgan Stanley to "write a check."  In that context, if the law firm was going to accept the engagement on a partial contingency fee, it makes sense that it would want it to be based on reduction of the estate's apparent liability to Morgan Stanley as an alternative to recovery of additional funds from Morgan Stanley.  The evidence in the record is that this type of hybrid arrangement, based in part upon reduction of liability, was not uncommon in Mr. Vellone's experience or in lender liability litigation generally.  In that regard, I bear in mind not only that Mr. Adam presented no contrary evidence but also that the bankruptcy court explicitly found the testimony of both the Trustee and Mr. Vellone to be credible.

Third, there was no objection to the settlement between the estate and Morgan Stanley. Mr. Adam did not, for example, complain that the settlement provided no influx of additional cash to the estate.  On the contrary, his counsel commented more than once during the hearing that the settlement was beneficial to the estate.  Reflecting his satisfaction with the legal work that culminated in the settlement, Mr. Adam continues to have no objection to the hourly rate

portion of the fee award ($73,086.37) or to the award of costs ($10,086.37).  *Id.* at 13.  He would also consider a fee based on 100% of the hours recorded at the law firm's normal hourly rates (i.e., $97,448.50) to be reasonable.  *Id.* at 15.

The foregoing background puts the fee agreement in context but begs the question of whether basing a contingency fee on as reduction in the client's liability is legally valid.  I turn to that next.

Mr. Adam begins by arguing that there was money to be had.  For example, the Adversary Proceeding could have obtained the return of the $5.8 million "improvidently disbursed."  ECF No. 9 at 17.  Whether the litigation might have accomplished reimbursement of that payment, or even more – and at what cost – are matters of speculation.  The Trustee made a judgment call, and there is no basis in the record to assume that there would have been a pot of gold at the end of the rainbow had the litigation ground on.

Next, Mr. Adam suggests, as he has before, that the Colorado Contingent Fee Rules apply here.  I doubt it.  Mr. Adam cites no Tenth Circuit or Supreme Court authority, nor have I found any, indicating that state law would regulate the fee paid pursuant to a federal statute to a lawyer hired by a bankruptcy trustee to represent the estate in bankruptcy court.  In my view regulation of such fees is a matter of federal law.  *See In re 5900 Associates, Inc.,* 468 F.3d 326, 329 (6th Cir. 2006) ("Fees in a bankruptcy proceeding are governed by federal, not state, law.").

In any event, even if the Colorado Contingent Fee Rules were applied, I do not find them to be supportive of Mr. Adam's position that a contingent fee may not be based on reduction of a client's liability to a third person.  Rule 1, headed "Definitions," defines the term "contingent fee agreement" as a written agreement for legal services "under which compensation is to be

contingent in whole or in part upon the *successful accomplishment or disposition of the subject matter of the agreement.*" (emphasis added).  That is consistent with the fee agreement here. Rule 5, headed "Contents," requires the agreement to include "a statement of the contingency upon which the client is to be liable to pay compensation otherwise than from amounts collected for him by the attorney."  The clear inference is that contingency fees are not necessarily based on "amounts collected" by the attorney.  It is true that the form provided with the Rules contains the sentence, "The client will pay the attorney (including any associated counsel) ___ percent of the (gross amount collected) (net amount collected)."  Form 2.  The form is designed for the typical case where the fee is based on monies collected.  It does not follow that it is the only way that a contingency can be structured.

Mr. Adam is on stronger ground when he cites *In re Bjone,* No. 86-05426, 1987 WL 857514 (Bankr. D. N.D. April 28, 1987), not because the case has precedential value here but because it gets to the heart of the potential weakness in a "reduction of liability" contingent fee arrangement: determination of the amount of the savings to the client.  As always, the facts are important.  The lawyer represented Bjone in two cases, both arising from a falling out among partners over the financing and construction of a condominium project.  In one case the partners sued Bjone and others, including a bank, for $3.5 million plus punitive damages.  The lawyer agreed to charge $100 per hour to defend Bjone in that case.  Bjone was the plaintiff in the second case, seeking indemnity from the bank.  In that case the lawyer agreed to represent Bjone for a fee "contingent and based upon recovery as follows: settlement before trial, 25%; after commencement of trial, 33 1/3%; after appeal 40%." *Id.* at *1.

While the cases were pending Bjone filed a Chapter 7 bankruptcy case.  Then both cases were settled, the first by a payment to Bjone of $35,000 (and a mutual release), and the second by releasing Bjone from his guarantees of a $450,000 note, a $95,000 mortgage debt, and liability under various retail installment contracts.  *Id.*

The problem arose when the lawyer determined, in a manner not specified to the bankruptcy judge, that the releases in the second case resulted in savings to Bjone of $180,000.  The lawyer combined those savings with the $35,000 payment in the first case and, claiming thus to have achieved a $215,000 "recovery," sought a fee of 25% of that amount based on the fee agreement in the second case.  Bjorn objected.

The bankruptcy court, noting that a contingent fee based on an amount perceived by the attorney to be a net savings to the client, cited *Wunschel Law Firm, P.C. v. Clabaugh,* 291 N.W. 2d 331 (Iowa 1980).  There the fee agreement did provide for a fee of one-third of any amount saved the client.  The client was the defendant in a lawsuit wherein the prayer for relief in the complaint was for $17,500.  When the case was settled for $1,750, the lawyer contended that he had therefore saved the client $15,750 and demanded one third of that amount as his fee.  The Iowa Supreme Court found that, absent agreement by the client, basing a fee on difference between the ad damnum clause in the complaint and the amount ultimately awarded is so speculative and unreasonable as to be void on grounds of public policy.  The court permitted the lawyer to seek recovery on a quantum meruit basis.

Similarly, the bankruptcy judge in *Bjone* found that the lawyer's suggestion that he had saved Bjone client $180,000 was speculative and not an appropriate basis on which to determine a fee.  He permitted the lawyer to reapply for a fee award on a quantum meruit basis.  *Id.* at 3.

The facts here, however, are distinguishable in a manner that makes a difference.  One distinction, of course, is that unlike *Bjorn* (although similarly to *Wunschel),* the fee agreement here does expressly provide for a contingent fee based on reduction in the client's liability.  That alone is not dispositive, as the bankruptcy court always retains the ultimate authority to determine a reasonable fee based upon consideration of the § 330 and *Johnson* factors.  But here, unlike both of those cases, the client did not object to the requested fee; on the contrary, the Trustee affirmatively supported the fee request before the bankruptcy court.  Also, Mr. Vellone provided a specific method of calculating the amount of the savings to the estate, based on the amount of the estate's funds that he contends were subject to Morgan Stanley's secured and unsecured claims.  Finally, in the present case the bankruptcy court determined that the amount was reasonable, before and after applying the § 330 and *Johnson* factors.

The potential soft spot here is that the bankruptcy court did not make specific findings as to the reasonableness of the law firm's calculation of the amount saved.  To be sure, the Trustee did not dispute the amount.  Even Mr. Adam did not dispute the calculations.  Still, it would have been better practice for the bankruptcy court to have made additional findings.  But because Mr. Adams did not dispute the calculation or offer an alternative calculation in his appeal, I do not address it further.  I note that expressly in the event that a challenge to the calculation of the amount saved might be raised for the first time on further appeal.

In sum, I do not agree that a contingent fee must, as a matter of law, be based on an influx of cash to the client.  It can, in appropriate circumstances, be based on reduction of the client's liability, so long as the reduction or "savings" can reasonably be determined.

**B.   Basing a Fee on the Cash in the Client's Bank Account**

Mr. Adam argues that a contingency fee award should not be based on the amount of cash in the estate's bank account.  ECF No. 9 at 22.  The argument is a "straw man."  The fee was calculated on the amount that Morgan Stanley would have taken out of the estate's account had its claims been enforced.  If, as the Trustee feared, those claims would have gobbled up all the remaining funds, then the fee could be characterized as having been based on the cash in the bank account, but the fact would remain that the cash was instead preserved for distribution to the unsecured creditors other than Morgan Stanley.  Mr. Adam notes that Morgan Stanley's actual claim exceeded $50 million, but that neither Mr. Vellone nor the bankruptcy court (nor the Trustee) suggested a $7.5 million fee award.  *Id.*  Of course not.  You cannot save money that the estate did not have.

Mr. Adam poses a better question when he asks about the implications that basing a fee on savings might have "for bankruptcy proceedings where submitted secured and unsecured creditor claims are challenged (as done every day), and then abandoned or reduced."  *Id.* at 24.  I cannot pretend to know what occurs in bankruptcy courts "every day," nor do I have any basis to comment on the extent to which the present facts might be considered to be unique.  What I can comfortably say is that no matter what might be agreed between a trustee and retained counsel, the ultimate authority is the bankruptcy court.  Any fee would have to be found to be reasonable after application of the relevant factors.  The *Bjone* case is an example of a court's rejecting a fee agreement in favor of a quantum merit recovery.  The bankruptcy court here found that the

requested fee, both in structure and amount, was reasonable based on the record before it.  Mr.

Adam has not given me any basis to find otherwise.

### C. <u>**Colorado Law Regulating Contingency Fee Agreements**</u>.

In the last section of his brief Mr. Adam suggests that the fee agreement is inconsistent

with the Colorado Contingent Fee Rules and, thereby, with the Colorado Rules of Professional

Conduct.[10]  I disagree.

Taking the Colorado Contingent Fee Rules first, I have indicated my doubt that those

rules affect a bankruptcy court's determination of the reasonableness of an attorney's fee.  *See*

*supra* at 19-20.  I also noted that those rules, even if applicable, do not prohibit a contingency fee

based upon reduction in the client's potential liability to a third person.  *Id.*  Mr. Adam adds, as

he did during the bankruptcy court hearing, that Rule 4(a) of the Colorado Contingent Fee Rules

requires a written disclosure statement in addition to a written contingency fee agreement.

However, again even assuming for the sake of argument that those rules apply, and also

assuming without deciding that Mr. Adam has standing to raise this objection, the only evidence

in the record is Mr. Vellone's testimony that he made the required disclosures to the Trustee, and

he believes that he did so in writing as well as orally.  R. 262-64.

As for the Rules of Professional Conduct, Rule 1.5 provides that a lawyer "shall not make

an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for

expenses."  It goes on to list the factors that should be considered in determining the

---

[10]  The Colorado Rules of Professional Conduct are found as an Appendix to Chapters 18 to 20,
COLORADO COURT RULES – STATE (2015).

reasonableness of a fee.  They are largely the same factors that are found in § 330 of the Bankruptcy Code and in the *Johnson* case.[11]

I also note that the American Bar Association's Standing Committee on Ethics and Professional Responsibility concluded in Formal Opinion 93-373, issued April 16, 1993, that the Model Rules of Professional Conduct "do not prohibit 'reverse' contingent fee agreements for representation of defendants in civil cases where the contingency rests on the amount of money, if any, saved the client, provided the amount saved is reasonably determinable, the fee is reasonable in amount under the circumstances, and the client's agreement to the fee arrangement is fully informed." (quoting the Committee's summary of its opinion).  As discussed, the law firm provided a method of determining the savings that has not been challenged; the bankruptcy court determined that the amount was reasonable after applying the relevant factors; and the Trustee, himself a lawyer, was fully informed and was supportive of the requested fee.

## ORDER

For the foregoing reasons, the order of the bankruptcy court issued September 12, 2014 awarding the law firm of Allen & Vellone, P.C. an attorney's fee of $73,086.37, calculated at 75% of the firm's normal hourly rates; plus $464,999.58, the contingent fee component of the fee based on 15% of $3,099,997.22; plus $10,145.82 in expenses, is AFFIRMED.

DATED this 6th day of July, 2015.

BY THE COURT:

---

[11] These factors are (1) time and labor required, (2) likelihood of preclusion of other employment, (3) fee customarily charged in the locality, (4) amount involved and results obtained, (5) time limitations imposed by the client or circumstances, (6) nature and length of the professional relationship, (7) experience, reputation, and ability of the lawyer(s), and (8) whether the fee is fixed or contingent.

R. Brooke Jackson
United States District Judge